# UNITED STATES DISTRICT COURT
for the
District of Columbia

In the Matter of the Seizure of )
*(Briefly describe the property to be seized)* )
) Case No. 1:19-sz-00020 (RMM)
OIL TANKER "GRACE 1" (IMO 9116412) AND )
ALL PETROLEUM ABOARD OIL TANKER )
"GRACE 1" (IMO 9116412) )

### AMENDED APPLICATION FOR A WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the jurisdiction of the District of _____Columbia_____ is subject to forfeiture to the United States of America under _____ U.S.C. § _____ *(describe the property)*:

50 U.S.C. § 1705; 18 U.S.C. §§ 1344, 1349, and 1956; 18 U.S.C. § 981(a) and 28 U.S.C. § 2461(c); and 18 U.S.C. § 982(a); (describe the property):

OIL TANKER "GRACE 1" (IMO 9116412) AND ALL PETROLEUM ABOARD OIL TANKER "GRACE 1" (IMO 9116412)

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

☐ Continued on the attached sheet.

_____(Signed telephonically)_____
*Applicant's signature*

_____Special Agent Thomas Tamsi, HSI_____
*Printed name and title*

Sworn to before me and signed telephonically.

Date: 08/14/2019

_____[signature]_____
*Judge's signature*

City and state: District of Columbia

Robin M. Meriweather, U.S. Magistrate Judge
*Printed name and title*

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br>OIL TANKER "GRACE 1" (IMO 9116412) AND<br>ALL PETROLEUM ABOARD OIL TANKER<br>"GRACE 1" (IMO 9116412) | ) )<br>) Case No. 1:19-sz-00020 (RMM)<br>) ) |

## AMENDED WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the ____jurisdiction of the____ District of ____Columbia____ be seized as being subject to forfeiture to the United States of America. The property is described as follows:
OIL TANKER "GRACE 1" (IMO 9116412) AND ALL PETROLEUM ABOARD OIL TANKER"GRACE1" (IMO 9116412)

AS FURTHER DESCRIBED IN THE AFFIDAVIT

I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property on or before ____08/28/2019____
*(not to exceed 14 days)*

☐ in the daytime – 6:00 a.m. to 10:00 p.m.     ☑ at any time in the day or night, as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to United States Magistrate Judge ____Robin M. Meriweather____.
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30).*

☐ until, the facts justifying, the later specific date of _____.

Date and time issued: 08/14/2019 @ 6:45 PM            *(signature)*
                                                                            *Judge's signature*

City and state: District of Columbia            Robin M. Meriweather, U.S. Magistrate Judge
                                                                    *Printed name and title*

AO 109 (Rev. 12/09) Warrant to Seize Property Subject to Forfeiture (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of: | | |
| Inventory of the property taken: | | |

### Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# AMENDED AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Thomas Tamsi, being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION

1. I make this affidavit in support of an application for a seizure warrant for Oil Tanker *Grace 1*, bearing International Maritime Organization (IMO) Number 9116412 ("*Grace 1*"), a photo of which is contained in Attachment A, and All Petroleum Aboard Oil Tanker *Grace 1* (collectively the "Target Properties"). There is probable cause to believe that the Target Properties are subject to seizure and forfeiture as described herein.

2. U.S. law allows the Target Properties to be seized and forfeited. The United States will make a legal assistance request to Gibraltar requesting restraint of the Target Properties for the purposes of forfeiture.

3. According to publically-available news reporting, on or about July 11, 2019, the Royal Gibraltar Police arrested the captain and chief officer of the *Grace 1*.

4. I am a Special Agent of the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and have been since November 2007. I am currently assigned to the Counter Proliferation Investigations Group at the HSI Office of the Special Agent in Charge in Denver, Colorado. Prior to my employment with HSI, I worked as a Special Agent with the U.S. Department of Defense ("DOD") Defense Logistics Agency Criminal Investigations Activity from March 2003 to November 2007 and as a Special Agent with the U.S. Air Force Office of Special Investigations from May 1999 to March 2003. I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center.

1

5. My duties as a Special Agent for ICE HSI include, but are not limited to, investigating violations of federal law, including the illegal export of arms and strategic technology commodities from the United States and violations of the Bank Secrecy Act and Money Laundering Control Act. I am familiar with the federal laws relating to the unlawful export of arms and commodities from the United States, as specified and regulated by the Department of State ("DOS") Directorate of Defense Trade Controls ("DDTC"); Department of Commerce ("DOC") Bureau of Industry and Security ("BIS"); and the Department of the Treasury Office of Foreign Assets Control ("OFAC"). I have received training related to identifying the techniques, methods, and procedures employed by groups, organizations, companies, corporations, and individuals to export goods and commodities in violation of United States export laws, as well as laundering funds related to such transactions into and out of the United States. In addition, I have received specific instruction and training on conducting criminal investigations associated with export law violations, and have participated in numerous such investigations. I have also participated in gathering evidence to obtain search and seizure warrants relating to financial crimes and the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1707.

6. The facts set forth in this affidavit are based on information that I have obtained from my personal involvement in the investigation and from other law enforcement officers who have been involved in this investigation, on documents that I have reviewed, and on my training and experience. Where I have reported statements made by others or from documents that I have reviewed, those statements are reported in substance and in part, unless otherwise indicated.

7. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Because this Affidavit is being submitted for a limited purpose, I have not set forth all of the information known

to me concerning this investigation. Instead, I have set forth information that I believe to be sufficient to establish probable cause in support of the government's application for a warrant to seize the Target Properties.

8. Specifically, based on the facts set forth in this affidavit, there is probable cause to believe that the subjects of the investigation have committed substantive and conspiracy violations of the money laundering statute, bank fraud statute, and IEEPA. As such, there is probable cause to believe that the Target Properties are subject to forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), 28 U.S.C. § 2461, and 18 U.S.C. § 982(a)(1), as proceeds of the above violations, and as property involved in such violations.

9. There is also probable cause to believe the Target Properties are foreign assets or sources of influence of the Iranian Islamic Revolutionary Guard Corps (IRGC), a designated foreign terrorist organization, which has engaged in planning and perpetrating federal crimes of terrorism as defined in 18 U.S.C. § 2332b(g)(5), and is therefore subject to seizure and forfeiture under 18 U.S.C. § 981(a)(1)(G)(i).

## II. STATUTORY BACKGROUND

### A. The International Emergency Economic Powers Act

10. This investigation relates to violations of the Regulations and Executive Orders issued pursuant to IEEPA, codified at 50 U.S.C. § 1701 *et seq.* IEEPA gives the President certain powers, defined in section 1702, to deal with any threats with respect to which the President has declared a national emergency, and prescribes criminal penalties for violations thereunder. *See* 50 U.S.C. § 1705(a). A conspiracy to violate IEEPA is prohibited by 18 U.S.C. § 371.

### B. Bank Fraud

11. 18 U.S.C. § 1344 criminalizes the execution, or attempt to execute, a scheme or artifice: (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.

12. 18 U.S.C. § 1349 criminalizes a conspiracy to violate § 1344.

### C. Money Laundering

13. 18 U.S.C. § 1956(a)(2)(A) (the international promotional money laundering statute) criminalizes, *inter alia*, transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer a monetary instrument or funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity. The funds involved in this international transportation of funds are not required to be proceeds of unlawful activity.

14. Pursuant to 18 U.S.C. § 1956(c)(7)(D), the term "specified unlawful activity," includes a violation of the IEEPA and bank fraud statute.

15. 18 U.S.C. § 1956(h) criminalizes a conspiracy to violate § 1956.

### D. Forfeiture Statutes

16. This application seeks a seizure warrant under both civil and criminal authority, because the Target Properties could easily be placed beyond process if not seized by warrant. News reporting, including from the Iranian state media, has claimed that the restrained Target Properties will be released from their current detention in Gibraltar on August 15, 2019, which is the date of the Gibraltarian court hearing on their respective investigation. After such release, the Target Properties would likely sail back to Iran via international waters where it could not be seized.

4

17. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of the IEEPA is subject to civil forfeiture. Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the same quantum of property is subject to criminal forfeiture.

18. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of the bank fraud statute is subject to civil forfeiture. Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the same quantum of property is subject to criminal forfeiture.

19. Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction, in violation of 18 U.S.C. § 1956, or any property traceable to such property is subject to civil forfeiture. Pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in a violation of 18 U.S.C. § 1956, or any property traceable to such property is subject to criminal forfeiture.

20. Pursuant to 18 U.S.C. § 981(a)(1)(G)(i), all assets, foreign or domestic, of an organization engaged in planning or perpetrating any Federal crime of terrorism (as defined in section 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property, are subject to civil forfeiture, as are all assets, foreign or domestic, affording any person a source of influence over any such entity or organization. Pursuant to 18 U.S.C. § 981(a)(1)(G)(i) and 28 U.S.C. § 2461(c), the same quantum of property is subject to criminal forfeiture.

21. These money laundering and terrorism forfeiture authorities apply to a larger class of property than the IEEPA and bank fraud forfeiture authorities.

   a. Money-laundering based forfeitures are not limited to the proceeds of the crime. Money laundering forfeiture encompasses all property "involved in" the crime,

which can include so-called "clean" or "legitimate" money that is comingled with "tainted" money derived from the specified unlawful activity.

   b. Terrorism-based forfeitures cover the broadest categories of property, as it includes *all* property foreign and domestic, irrespective if the property has any nexus to the crime or the United States.

22. Pursuant to 28 U.S.C. § 1355(b)(2), this Court has default venue and jurisdiction over property subject to civil forfeiture that is located in a foreign country or been detained by a foreign authority. The Target Properties have been detained by a foreign authority.

23. Title 18 U.S.C. § 981(b) states that property subject to forfeiture under § 981 may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," and may be executed "in any district in which the property is found," if there is probable cause to believe the property is subject to forfeiture. Section 982(b)(1) incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for all stages of a criminal forfeiture proceeding. Section 853(f) permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture.

24. Pursuant to 18 U.S.C. § 981(b)(3), a seizure warrant may be executed against foreign property when the seizure warrant is transmitted to the relevant central authority of the foreign state for service in accordance with any treaty or other international agreement.

25. Seizures are appropriate from this district, as the subjects of the investigation failed to obtain a license to engage in U.S. dollar transactions from the Treasury Department, which is located in Washington, D.C., deceived U.S. correspondent banks into ignoring their required anti-money laundering obligations, as regulated by the Federal Reserve Board, which is located in Washington, D.C., and this court has default venue for foreign property subject to civil forfeiture.

## III. FACTS ESTABLISHING PROBABLE CAUSE

### A. Overview of the *Grace 1*

26. The *Grace 1*, which was previously flagged in Panama, is a large oil tanker capable of carrying 2,127,146 barrels (approximately 290,000 metric tons) of crude oil.

27. Based on investigation, U.S. authorities have determined that the *Grace 1* has a complex ownership structure. It is owned, managed, and crewed by separate companies that appear to be operating on behalf of other parties. The investigation has revealed, including from statement by the IRGC, that Target Properties, which include, the *Grace 1*, are ultimately controlled by the IRGC.

28. On October 25, 2007, the Department of State and Treasury Department designated the IRGC pursuant to E.O. 13382 in connection with its support to Iran's ballistic missile and nuclear programs. The Treasury designation stated:

> Considered the military vanguard of Iran, the Islamic Revolutionary Guard Corps (IRGC; aka Iranian Revolutionary Guard Corps) is composed of five branches (Ground Forces, Air Force, Navy, Basij militia, and Qods Force special operations) in addition to a counterintelligence directorate and representatives of the Supreme Leader. It runs prisons, and has numerous economic interests involving defense production, construction, and the oil industry. Several of the IRGC's leaders have been sanctioned under UN Security Council Resolution 1747.
>
> The IRGC has been outspoken about its willingness to proliferate ballistic missiles capable of carrying WMD. The IRGC's ballistic missile inventory includes missiles, which could be modified to deliver WMD. The IRGC is one of the primary regime organizations tied to developing and testing the Shahab-3. The IRGC attempted, as recently as 2006, to procure sophisticated and costly equipment that could be used to support Iran's ballistic missile and nuclear programs.

29. On April 8, 2019, the President designated the IRGC as a Foreign Terrorist Organization. The designation noted that the IRGC actively participates in, finances, and promotes terrorism.

30. According to the Department of Treasury, the IRGC and its major holdings have a dominant presence in Iran's commercial and financial sectors, controlling multi-billion dollar businesses and maintaining extensive economic interests in the oil industry and the profits from these activities support the IRGC's full range of nefarious activities, including the proliferation of weapons of mass destruction (WMD) and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad. *See* https://home.treasury.gov/news/press-releases/sm703.

31. After the President implemented Executive Order 13846 on August 6, 2018, the Iranian Oil Minister, Bijan Namdar Zanganeh, said in an interview, "We have unofficial or unconventional sales, all of which are secret, because if they are made known America would immediately stop them."

32. The investigation has revealed that Iships Management Pte Ltd (Iships), a company located in Singapore, is the manager of the *Grace 1*. The investigation has revealed that Iships is a front company that was created to conduct and conceal illegal oil sales. Consistent with a front company, Iships' purported business address in Singapore contained no evidence of it ever having conducted business there.

33. Subpoena returns from U.S. financial institutions revealed that in 2016, Iships made at least six U.S. dollar payments totaling US$34,108.79 to a U.S. company (U.S. Company 1). Records related to these payments referenced the *Grace 1*. Publicly-available information has revealed that U.S. Company 1 purports to provide petroleum tanker products and related logistics solutions. As demonstrated below, the *Grace 1* is an Iranian owned vessel. As such, these U.S. dollar transactions, which routed through the United States, would have required a license from OFAC, however, no such licenses were sought or received.

34. Information obtained from a U.S. court-authorized search warrant for the email accounts of employees of Iships revealed that it is part of a group of companies named the Avantgarde Group. The Avantgarde Group has received payments from Mohammad Saeed Al Aqili and the Al Aqili Group. OFAC sanctioned Mohammad Saeed Al Aqili and the Al Aqili Group for assisting the Iranian regime in selling oil in evasion of U.S. trade/economic sanctions. OFAC noted in the designation that the Al Aqili Group arranged oil sales for the IRGC and facilitated the circumvention of oil sanctions by disguising the oil's origin.

35. A financial ledger, located in the email account of an Iships employee, tracked illicit U.S. dollar transactions conducted by this network of front companies. The ledger reflects payments by the Avantgarde Group to the *Grace 1*. A subpoena to a U.S. Company that provides insurance to maritime vessels (U.S. Company 2) revealed that multiple companies in the Avantgarde Group have laundered wire payments via front companies to purchase insurance from U.S. Company 2, including for the *Grace 1*.

36. In addition to Iships' connection to the Aqili Group, Iships is also directly affiliated with the National Iranian Oil Company (NIOC), which OFAC has determined is an agent or affiliate of the IRGC.

37. For example, in September 2017, an Iships employee identified another Iships employee as a "NIOC [National Iranian Oil Company] agent" who could "provide Letter of Supply Guarantee from NIOC" and "supply all ranges Iranian oil." The employee referred to as an agent of NIOC was involved with communications between Iships and U.S. Company 1.

38. Specifically, on September 24, 2012, OFAC stated:

> Under the current Iranian regime, the IRGC's influence has grown within NIOC. For example, on August 3, 2011, Iran's parliament approved the appointment of **Rostam Qasemi, a Brigadier General in the IRGC**, as Minister of Petroleum. Prior to his appointment, Qasemi was the

9

commander of Khatam Al-Anbia, a construction and development wing of the IRGC that generates income and funds operations for the IRGC. Even in his new role as Minister of Petroleum, Qasemi has publicly stated his allegiance to the IRGC. As the IRGC has become increasingly influential in Iran's energy sector, Khatam Al-Anbia has obtained billions of dollars worth of contracts with Iranian energy companies, including NIOC, often without participating in a competitive bidding process.

(emphasis added).

39. As described by OFAC, Rostam Qasemi was involved with both NIOC and the IRGC. On February 10, 2010, OFAC designated Rostam Qasemi as an IRGC General who used companies to generate funds for the IRGC.

40. Search warrants from the email account of an Iships employee included an email chain from June 2014, showing that the Iships employee received a confidentiality agreement from Petro Iran Development Company (PEDCO), which OFAC has designated as a subsidiary of NIOC. The confidentiality agreement related to the provision of oilfield services products to "the South Pars Oil Layer Project." This email chain included an internal PEDCO email, which appears to have carbon copied Rostam Qasemi. An Iranian news article from May 2013, corroborated that Rostam Qasemi visited the South Pars gas field.

41. After the *Grace 1* was seized, the IRGC Deputy Commander Rear Admiral Ali Fadavi, publically confirmed "we [IRGC] had rented the ship and we [IRGC] carried the cargo."

**B. Recent Voyage of the Target Properties**

42. Given its size and capacity, the *Grace 1* is required to use the Automatic Identification System (AIS), which was developed in the 1990s as a maritime safety feature that exchanges vessel information electronically among ships that are near each other.

43. Publically-available AIS data revealed that, between 2018 and 2019, the *Grace 1* appeared to deactivate its AIS to conceal its location. Specifically, from on or about November 1

through November 20, 2018, AIS data revealed that the *Grace 1* loitered at the western end of the Persian Gulf near the Iran/Iraq border. The *Grace 1* deactivated its AIS as it travelled towards the Iranian port of Asaluyeh, a location where oil tankers are known to load and unload petroleum. The *Grace 1*'s AIS remained off until December 15, 2018. When the AIS resumed functioning, the depth of the *Grace 1* was consistent with oil having been loaded while the AIS was turned off.

44. U.S. authorities learned from AIS data and witness interviews that, around January 16, 2019, the *Grace 1* was co-located with an oil tanker named the Kriti Island in the Gulf of Oman, where it conducted a ship-to-ship transfer to the Kriti Island.

45. U.S. authorities also learned from AIS data and witness interviews that, around January 22, 2019, the *Grace 1* was co-located with an oil tanker named the Marshal Z, a tanker named by OFAC in a March 2019 public advisory as having engaged in ship-to-ship transfers of petroleum destined for Syria, in the Gulf of Oman, where it conducted a ship-to-ship transfer to the Marshal Z. Shortly thereafter, the Marshal Z engaged in another ship-to-ship transfer.

46. U.S. authorities learned from AIS data that the *Grace 1*'s transponder turned off again from on or about April 8 to April 16, 2019, as it traveled in the Persian Gulf toward Iran. Information obtained during the investigation revealed that, during this period, the *Grace 1* received Iranian oil from Kharg Island, Iran. The *Grace 1*'s transponder became operational again on or about April 17, 2019, as it departed Kharg Island with Iranian oil.

47. The Target Properties then traveled around Africa and was believed to be travelling to Syria for offload of the petroleum.

48. On or about July 4, 2019, the British Royal Marines and authorities in Gibraltar detained the Target Properties for suspected violations of European Union sanctions on Syria.

49. According to publically-available news reporting, on or about July 11, 2019, the Royal Gibraltar Police arrested the captain and chief officer of the *Grace 1* for such sanctions violations.

50. According to publically-available news reporting, the detention of the Target Properties is believed to be in effect until an August 15, 2019 hearing. As noted above, publically-available news reporting indicated that the Gibraltarians may release the Target Properties at that time.

### C. Illicit Payments Through U.S. Financial System Related to the *Grace 1*'s Recent Voyage

#### i. Fraudulent Documents

51. Witness interviews revealed that individuals associated with the *Grace 1* provided those parties who participated in the above-described ship-to-ship transfers with the *Grace 1* with fraudulent shipping documents stating that the *Grace 1* had obtained oil and departed from the Iraqi shipping port, Basra Oil Terminal. U.S. authorities believe that these shipping documents were forged as a means to conceal the fact that the *Grace 1* had actually obtained oil and departed from Iran. U.S. authorities presented copies of the shipping documents to the relevant authorities in Iraq, who confirmed that the documents were fraudulent.

52. Based on similar investigations in the past, U.S. authorities believe that these fraudulent documents were created not only to deceive the parties involved in the above-described ship-to-ship transfers but also may have been created to deceive any financial institutions involved in the related financial transactions. Financial institutions often request supporting documentation relating to financial transactions, particularly when they involve high-risk industries such as the transshipment of petroleum, as part of their anti-money laundering due diligence efforts. Although

such records may not have been presented to U.S. correspondent banks, the preparation of such documents is still consistent with known money laundering and bank fraud schemes.

53. The Financial Action Task Force has urged all jurisdictions to apply enhanced due diligence measures to protect against the terrorist financing risk emanating from Iran and the threat this poses to the international financial system, which in turn has caused banks to further scrutinize transactions with possible Iranian entities.

54. The Treasury Department has consistently underscored the risks of conducting business with entities associated with Iran. It has warned that Iran continues to use deceptive tactics including front and shell companies to exploit markets in numerous countries to fund its nefarious activities. These tactics include forging documents, obfuscating data, and hiding illicit activities under official cover of government entities, among many others. On October 11, 2018, the Treasury Department issued a comprehensive advisory outlining the deceptive practices the Iranian regime employs to access the financial system with the intention of furthering its illicit activities.

### ii. Transfers Using Multiple Intermediaries

55. U.S. authorities believe that multiple companies engaged in multiple financial transactions related to the *Grace 1*'s recent illegal shipment of Iranian oil through the U.S. financial system. Specifically, the companies involved with these transactions were used as intermediaries to avoid listing the ultimate senders and beneficiaries on these U.S. dollar transactions; in some instances, the parties described herein used multiple payment intermediaries when dealing with the same counterparties. This activity—the international movement of funds by front companies in connection with illegal activity and the provision of false information to U.S. financial

institutions regarding the parties to financial transactions—violates U.S. bank fraud and money laundering laws.

56. Specifically, information from U.S. financial institutions, obtained by U.S. subpoena, revealed that, on or about December 20, 2018, Anisa Shipping, an entity registered in Saint Kitts and Nevis, laundered US$4 million to Tricolor Enterprises Limited, another entity registered in Saint Kitts and Nevis. This payment, which referenced the *Grace 1* and an offshore oil rig, routed through a correspondent bank account in the United States because the payment was in U.S. dollars. Information obtained during the investigation revealed that Tricolor Enterprises Limited is located at the same address in Saint Kitts and Nevis as Blue Energy Trade LTD, an oil procurement company sanctioned by OFAC for shipping petroleum to Syria.

57. Information from U.S. financial institutions, obtained by U.S. subpoena, further revealed that on or about December 26, 2018, Anikom Projects and Logistics FZE, an entity registered in the United Arab Emirates, wired US$1.3 million to Anisa Shipping. This payment, which referenced the *Grace 1* and an offshore oil rig, routed through a correspondent bank account in the United States because the payment was in U.S. dollars.

58. Information from U.S. financial institutions, obtained by U.S. subpoena, further revealed that, between on or about January 14 and 17, 2019, around the time the *Grace 1* conducted the ship-to-ship transfers with the Kriti Island, Blutide FZE, an entity registered in Singapore, laundered approximately US$7,145,286.32 via multiple payments to Sicaro Group Corp registered in Saint Kitts and Nevis, which has common ownership with Tricolor Enterprises Limited. One of these payments listed "Trade" on the wiring instructions. This payment routed through a correspondent bank account in the United States because the payment was in U.S. dollars.

59. Witness interviews revealed that Blutide FZE chartered the recent *Grace 1* petroleum shipment. Due to the timing of Blutide FZE's payment, the fact that it chartered the *Grace 1*, and its association with other companies that made payments related to the *Grace 1*, U.S. authorities believe the January 14 to January 17 payment was also associated with the *Grace 1*.

60. Information from U.S. financial institutions, obtained by U.S. subpoena, revealed that, on or about January 29, 2019, Blutide FZE wired US$495,021 to a company in Switzerland for the Kriti Island to transfer oil from the *Grace 1*. Documents associated with this payment indicated that the purpose of this payment was "Trade," which was the same instruction that Blutide FZE used when sending Sicaro Group Corp funds on or about January 14, 2019. This payment routed through a correspondent bank account in the United States because the payment was in U.S. dollars.

## IV. CONCLUSION

61. Based on the facts described above, there is probable cause to believe that the Target Properties are foreign assets or sources of influence of the IRGC, a designated terrorist organization engaged in planning and perpetrating federal crimes of terrorism, and thus subject to forfeiture. There is further probable cause to believe that U.S. dollar wires were sent by parties affiliated with the IRGC, which are traceable to and involved in the Target Properties, also making them subject to forfeiture.

Respectfully submitted,

<u>Signed Telephonically</u>
Thomas Tamsi
Special Agent
Homeland Security Investigations

Subscribed and sworn before me telephonically by Special Agent Thomas Tamsi per Fed. R. Crim. P. 41(d)(3) on this __14th__ day of August, 2019.

ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

# Attachment A

OIL TANKER – "*GRACE 1*" (IMO 9116412)

