AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | | |
|---|---|---|
| In the Matter of the Seizure of | ) | |
| *(Briefly describe the property to be seized)* | ) | |
| OIL TANKER BEARING INTERNATIONAL MARITIME ORGANIZATION (IMO) NUMBER 9116412, A/K/A "ADRIAN DARYA 1", F/K/A "GRACE 1" | ) ) ) | Case No.   1:19-sz-00020 (RMM) |

## AMENDED APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the <u>jurisdiction of the</u> District of _____ Columbia _____ is subject to forfeiture to the United States of America under _____ U.S.C. § _____ *(describe the property)*:

50 U.S.C. § 1705; 18 U.S.C. §§ 1344, 1349, and 1956; 18 U.S.C. § 981(a) and 28 U.S.C. § 2461(c); and 18 U.S.C. § 982(a); (describe the property):

OIL TANKER BEARING INTERNATIONAL MARITIME ORGANIZATION (IMO) NUMBER 9116412, A/K/A "ADRIAN DARYA 1", F/K/A "GRACE 1"

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

❐ Continued on the attached sheet.

(Signed telephonically)
_____
*Applicant's signature*

Special Agent Thomas Tamsi, HSI
_____
*Printed name and title*

Sworn to before me and signed telephonically.

Date:  08/30/2019

City and state:   District of Columbia

_____
*Judge's signature*

James E. Boasberg, U.S. District Court Judge
_____
*Printed name and title*

AO 109 (Rev. 12/09)  Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Seizure of | ) | |
| *(Briefly describe the property to be seized)* | ) | |
| OIL TANKER BEARING INTERNATIONAL | ) | Case No.    1:19-sz-00020 (RMM) |
| MARITIME ORGANIZATION (IMO) NUMBER | ) | |
| 9116412, A/K/A "ADRIAN DARYA 1", F/K/A | ) | |
| "GRACE 1" | | |

## AMENDED WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the          jurisdiction of the          District of          Columbia          be seized as being subject to forfeiture to the United States of America.  The property is described as follows:   OIL TANKER BEARING INTERNATIONAL MARITIME ORGANIZATION (IMO) NUMBER 9116412, A/K/A "ADRIAN DARYA 1", F/K/A "GRACE 1"

 AS FURTHER DESCRIBED IN THE AFFIDAVIT
I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property on or before          09/13/2019
                                                                                        *(not to exceed 14 days)*

❑ in the daytime – 6:00 a.m. to 10:00 p.m.          ☑ at any time in the day or night, as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to United States District Court Judge          James E. Boasberg                                    .
                                                   *(name)*

❑ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*   ❑ for          days *(not to exceed 30)*.

                                    ❑ until, the facts justifying, the later specific date of          .

Date and time issued:     08/30/2019

                                                                        *Judge's signature*

City and state:     District of Columbia          James E. Boasberg, U.S. District Court Judge
                                                              *Printed name and title*

AO 109 (Rev. 12/09)  Warrant to Seize Property Subject to Forfeiture (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>   1:19-sz-00020 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of:

Inventory of the property taken:

| **Certification** |
|---|

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____


_____

*Executing officer's signature*


_____

*Printed name and title*

## <u>AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT</u>

I, Thomas Tamsi, being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION

1.      I make this affidavit in support of an application for a seizure warrant for Oil Tanker bearing International Maritime Organization (IMO) Number 9116412, a/k/a "*Adrian Darya 1*," f/k/a/ "*Grace 1*" ("Target Property 1"), a photo of which is contained in Attachment A, and All Petroleum Aboard Oil Tanker bearing IMO Number 9116412 ("Target Property 2")[1] (collectively the "Target Properties").  There is probable cause to believe that the Target Properties are subject to seizure and forfeiture as described herein.[2]

2.      I am a Special Agent of the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and have been since November 2007.  I am currently assigned to the Counter Proliferation Investigations Group at the HSI Office of the Special Agent in Charge in Denver, Colorado.  Prior to my employment with HSI, I worked as a Special Agent with the U.S. Department of Defense ("DOD") Defense Logistics Agency Criminal Investigations Activity from March 2003 to November 2007 and as a Special Agent with the U.S. Air Force Office of Special Investigations from May 1999 to March 2003.  I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center.

---

[1]      Target Property 2 refers to the oil itself, irrespective of whether it is onboard the vessel bearing IMO Number 9116412, or has been transferred to other vessel(s) or offloaded at a port.

[2]      The government is submitting two seizure warrant applications, one for each of the Target Properties, based on this affidavit.

3.     My duties as a Special Agent for ICE HSI include, but are not limited to, investigating violations of federal law, including the illegal export of arms and strategic technology commodities from the United States and violations of the Bank Secrecy Act and Money Laundering Control Act.  I am familiar with the federal laws relating to the unlawful export of arms and commodities from the United States, as specified and regulated by the Department of State ("DOS") Directorate of Defense Trade Controls ("DDTC"); Department of Commerce ("DOC") Bureau of Industry and Security ("BIS"); and the Department of the Treasury Office of Foreign Assets Control ("OFAC").  I have received training related to identifying the techniques, methods, and procedures employed by groups, organizations, companies, corporations, and individuals to export goods and commodities in violation of United States export laws, as well as laundering funds related to such transactions into and out of the United States.  In addition, I have received specific instruction and training on conducting criminal investigations associated with export law violations, and have participated in numerous such investigations.  I have also participated in gathering evidence to obtain search and seizure warrants relating to financial crimes and the International Emergency Economic Powers Act ("IEEPA"), 50 United States Code ("U.S.C.") §§ 1701-1707.

4.     The facts set forth in this affidavit are based on information that I have obtained from my personal involvement in the investigation and from other law enforcement officers who have been involved in this investigation, on materials that I have reviewed, and on my training and experience.  Where I have reported statements made by others or from documents that I have reviewed, those statements are reported in substance and in part, unless otherwise indicated.

5.     This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  Because this

affidavit is being submitted for a limited purpose, I have not set forth all of the information known to me concerning this investigation.   Instead, I have set forth information that I believe to be sufficient to establish probable cause in support of the government's application for a warrant to seize the Target Properties.

6.      Specifically, based on the facts set forth in this affidavit, there is probable cause to believe that the subjects of the investigation have committed violations of the money laundering statute, bank fraud statute, and IEEPA.  As such, there is probable cause to believe that the Target Properties are subject to forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), 28 U.S.C. § 2461, and 18 U.S.C. § 982(a)(1), as proceeds of the above violations and as property involved in such violations.

7.      There is also probable cause to believe that the Target Properties are foreign assets or sources of influence of the Iranian Islamic Revolutionary Guard Corps (IRGC), a designated foreign terrorist organization, which has engaged in planning and perpetrating federal crimes of terrorism as defined in 18 U.S.C. § 2332b(g)(5), and is therefore subject to seizure and forfeiture under 18 U.S.C. § 981(a)(1)(G)(i).

## II.  STATUTORY BACKGROUND

### A.      The International Emergency Economic Powers Act

8.      This investigation relates to violations of the Regulations and Executive Orders issued pursuant to IEEPA, codified at 50 U.S.C. § 1701 *et seq.*  IEEPA gives the President certain powers, defined in Section 1702, to deal with any threats with respect to which the President has declared a national emergency and prescribes criminal penalties for violations thereunder.  *See* 50 U.S.C. § 1705(a).  A conspiracy to violate IEEPA is prohibited by 18 U.S.C. § 371.

### i.      Syrian Sanctions

9.      On May 11, 2004, the President issued Executive Order No. 13338, declaring a national emergency to deal with the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States posed by the actions of the Government of Syria in supporting terrorism, continuing its occupation of Lebanon, pursuing weapons of mass destruction and missile programs, and undermining United States and international efforts with respect to the stabilization and reconstruction of Iraq. Executive Order No. 13338 has been continued and expanded by Executive Order Nos. 13399, 13460, 13572, 13573, 13582, 13606, and 13608 (collectively, the "Syria Executive Orders").

10.      The Syria Executive Orders imposed economic sanctions on Syria. They prohibited, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Syria of any goods, technology, or services from the United States or by a United States person. The Syria Executive Orders also prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Syria Executive Orders.

11.      The Syria Executive Orders authorized the United States Secretary of the Treasury, in consultation with the United States Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out" these sanctions against Syria. Pursuant to this authority, the Secretary of the Treasury, through the OFAC, promulgated the Syrian Sanctions Regulations ("SSR"), 31 Code of Federal Regulations (C.F.R.) Part 542, implementing the sanctions required by the Syria Executive Orders.

12.      Additionally, as part of its enforcement efforts, OFAC publishes a list of individuals and entities owned or controlled by, or acting for or on behalf of, targeted countries. Collectively,

such individuals and companies are called "Specially Designated Nationals" or "SDNs." Their assets are blocked by OFAC, and U.S. persons are generally prohibited from dealing with them.

13.     Pursuant to Executive Order No. 13582 (dated August 17, 2011), the Banias Refinery Company, located in Baniyas, Syria, and the Homs Refinery Company, located in Homs, Syria, were added to the OFAC SDN List, effective May 8, 2014.  In doing so, OFAC concluded that the Banias and Homs Refinery Companies met the definition of the "Government of Syria," as set forth in section 8(d) of Executive Order No. 13582.

14.     As a result, absent permission from OFAC in the form of a license, the SSR prohibits, among other things, the following actions with Syria and the Banias Refinery Company:

a.   The exportation, re-exportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any services to Syria, including to the Banias Refinery Company; 31 C.F.R. § 542.207;

b.   Any transaction by a U.S. person or within the United States that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in the regulations; 31 C.F.R. § 542.205;

c.   United States persons, wherever located, from approving, financing, facilitating, or guaranteeing a transaction by a foreign person where the transaction by that foreign person would be prohibited by the SSR if performed by a United States person or within the United States; 31 C.F.R. § 542.210;

d.   Transactions in property that was in the United States, came within the United States, or that was or came within the possession or control of any United States person, including any foreign branch, of the Government of Syria or any other person whose property and interests in property are blocked; 31 C.F.R. § 542.201;

e.   Transactions involving persons who materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, the Government of Syria or any other person whose property and interests in property are blocked; 31 C.F.R. § 542.201; and

f.   Transactions involving blocked property owned or controlled by, directly or indirectly, the Government of Syria or any other person whose property and interests in property are blocked. 31 C.F.R. § 542.201.

**ii.   Iranian Transaction and Sanctions Regulation**

15.   Beginning with Executive Order No. 12170, issued on November 14, 1979, the President found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."

16.   On March 15 and May 6, 1995, the President issued Executive Orders Nos. 12957 and 12959, prohibiting, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person, and, on August 19, 1997, issued Executive Order No. 13059, clarifying the previous orders (collectively, the "Iran Executive Orders").  The Iran Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Iran Executive Orders.  Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2013, the Iranian Transactions and Sanctions Regulations, ("ITSR")) implementing the sanctions imposed by the Iran Executive Orders.

17.     The ITSR, 31 C.F.R. Part 560.204, prohibit, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, from the United States, or by a United States Person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, re-exportation, sale or supply of goods, technology or services to a third country knowing that such goods, technology or services are intended for Iran or the Government of Iran, without a license from OFAC.

18.     The ITSR also prohibits the supply of services where the benefit of such services is otherwise received in Iran, if such services are performed in the United States.  *See* 31 C.F.R. § 560.410.

19.     The ITSR provides that the transfer of funds, directly or indirectly, from the United States or by a U.S. person to Iran or the Government of Iran is a prohibited export, re-export, sale, or supply of services to Iran or the Government of Iran.  *See* 31 C.F.R. § 560.427(a).

20.     The ITSR further prohibits transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR.  31 C.F.R. § 560.203.

21.     Additionally, on August 6, 2018, the President, pursuant to IEEPA, issued Executive Order No. 13846, which, among other things, authorized the Secretary of State, in consultation with the secretaries of various other executive departments, to impose sanctions on individuals who knowingly engage in a significant transaction for the purchase, acquisition, sale, transport, or marketing of oil or petroleum products from Iran.

**B.      Bank Fraud**

22.      18 U.S.C. § 1344 criminalizes the execution, or attempt to execute, a scheme or artifice: (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.

23.      18 U.S.C. § 1349 criminalizes a conspiracy to violate § 1344.

**C.      Money Laundering**

24.      18 U.S.C. § 1956(a)(2)(A) (the international promotional money laundering statute) criminalizes, *inter alia*, transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer a monetary instrument or funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity.  The funds involved in this international transportation of funds are not required to be proceeds of unlawful activity.

25.      Pursuant to 18 U.S.C. § 1956(c)(7)(D), the term "specified unlawful activity," includes a violation of the IEEPA and bank fraud statute.

26.      18 U.S.C. § 1956(h) criminalizes a conspiracy to violate § 1956.

**D.      Forfeiture**

27.      This application seeks a seizure warrant under both civil and criminal authority, because the Target Properties could easily be placed beyond process if not seized by warrant. The Target Properties are currently traveling the high seas.

28.      Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of the IEEPA is subject to civil

forfeiture.  Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the same quantum of property is subject to criminal forfeiture.

29.     Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of the bank fraud statute is subject to civil forfeiture.  Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the same quantum of property is subject to criminal forfeiture.

30.     Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction, in violation of 18 U.S.C. § 1956, or any property traceable to such property is subject to civil forfeiture.  Pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in a violation of 18 U.S.C. § 1956, or any property traceable to such property is subject to criminal forfeiture.

31.     Pursuant to 18 U.S.C. § 981(a)(1)(G)(i), all assets, foreign or domestic, of an organization engaged in planning or perpetrating any federal crime of terrorism (as defined in 18 U.S.C. § 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property, are subject to civil forfeiture, as are all assets, foreign or domestic, affording any person a source of influence over any such entity or organization.  Pursuant to 18 U.S.C. § 981(a)(1)(G)(i) and 28 U.S.C. § 2461(c), the same quantum of property is subject to criminal forfeiture.

32.     These money laundering and terrorism forfeiture authorities apply to a larger class of property than the IEEPA and bank fraud forfeiture authorities:

        a.  Money-laundering based forfeitures are not limited to the proceeds of the crime.
            Money laundering forfeiture encompasses all property "involved in" the crime,
            which can include so-called "clean" or "legitimate" money that is comingled with
            "tainted" money derived from the specified unlawful activity; and

9

b.  Terrorism-based forfeitures cover the broadest categories of property, as it includes *all* property foreign and domestic, irrespective if the property has any nexus to the crime or the United States.

33.  Pursuant to 28 U.S.C. § 1355(b)(2), this Court has default venue and jurisdiction over property subject to civil forfeiture that is located in a foreign country or been detained by a foreign authority.

34.  Pursuant to 18 U.S.C. § 981(b), property subject to forfeiture under § 981 may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," if there is probable cause to believe the property is subject to forfeiture.  Section 982(b)(1) incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d) for all stages of a criminal forfeiture proceeding).  Section 853(f) permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture.

35.  Seizure warrants are appropriate from this district, as the subjects of the investigation failed to obtain a license to engage in U.S. dollar transactions from the Department of the Treasury, which is located in Washington, D.C., deceived U.S. correspondent banks into ignoring their required anti-money laundering obligations, as regulated by the Federal Reserve Board and the Office of the Comptroller of Currency, which are located in Washington, D.C., and this Court has default venue for foreign property subject to civil forfeiture.  Moreover, 18 U.S.C. § 3238 creates default venue in this Court for offenses, such as the ones under investigation, which begun or were committed upon the high seas or elsewhere out of the jurisdiction of any particular State or district.

### III.  FACTS ESTABLISHING PROBABLE CAUSE

**A.      Overview of the Target Properties**

36.      As demonstrated below, the Target Properties are Iranian owned and IRGC-controlled properties which were involved in a scheme to transship oil to Port Banias, Syria.

37.      Target Property 1 was previously flagged in Panama and is currently flagged as an Iranian vessel.  Target Property 1 is a large oil tanker capable of carrying 2,127,146 barrels (approximately 290,000 metric tons) of crude oil.  Target Property 2 is approximately 2.1 million barrels of crude oil aboard Target Property 1.

38.      U.S. authorities have determined that Target Property 1 has a complex ownership structure.  It is owned, managed, and currently crewed by separate companies that appear to be operating on behalf of other parties:

39.      The investigation has revealed that Iships Management Pte Ltd ("Iships"), a company located in Singapore, is the manager of Target Property 1.  The investigation has revealed that Iships is a front company that conducts and conceals illegal oil sales.  Consistent with a front company, Iships has not recently had a legitimate physical presence in Singapore, in part, as it is co-located with numerous other suspected front companies.

40.      Information obtained from a U.S. court-authorized search warrant for the email accounts of employees of Iships revealed that it is part of a group of companies named the Avantgarde Group.  The Avantgarde Group has received payments from Mohammad Saeed Al Aqili and the Al Aqili Group.  Pursuant to Executive Order No. 13645, OFAC designated Mohammad Saeed Al Aqili and the Al Aqili Group on April 29, 2014, for assisting the Iranian regime in selling oil in evasion of U.S. trade/economic sanctions.  OFAC noted in the designation

that the Al Aqili Group arranged oil sales for the IRGC and facilitated the circumvention of oil sanctions by disguising the oil's origin.

41.     A financial ledger, located in the email account of an Iships employee, tracked illicit U.S. dollar transactions conducted by this network of front companies.   The ledger reflects payments by the Avantgarde Group to Target Property 1.  Subpoena returns from a U.S. company that provides insurance to maritime vessels (U.S. Company 2) revealed that multiple companies in the Avantgarde Group have laundered U.S. dollar payments via front companies, such as Paradise Global (described below), as early as 2014 to purchase insurance from U.S. Company 2, including for Target Property 1.

42.     In addition to Iships's connection to the Aqili Group, Iships is also directly affiliated with the National Iranian Oil Company ("NIOC"), an OFAC designated entity.  Search warrant returns revealed that in September 2017, an Iships employee identified another Iships employee as a "NIOC [National Iranian Oil Company] agent" who could "provide Letter of Supply Guarantee from NIOC" and "supply all ranges [of] Iranian oil."  The employee referred to as an agent of NIOC was involved with communications between Iships and U.S. Company 1.

43.     On September 24, 2012, OFAC issued the following press release:

> Under the current Iranian regime, the IRGC's influence has grown within NIOC.  For example, on August 3, 2011, Iran's parliament approved the appointment of **Rostam Qasemi, a Brigadier General in the IRGC**, as Minister of Petroleum.   Prior to his appointment, Qasemi was the commander of Khatam Al-Anbia, a construction and development wing of the IRGC that generates income and funds operations for the IRGC.  Even in his new role as Minister of Petroleum, Qasemi has publicly stated his allegiance to the IRGC.  As the IRGC has become increasingly influential in Iran's energy sector, Khatam Al-Anbia has obtained billions of dollars worth of contracts with Iranian energy companies, including NIOC, often without participating in a competitive bidding process.

https://www.treasury.gov/press-center/press-releases/Pages/tg1718.aspx (emphasis added).

44.     Rostam Qasemi is involved in the Aqili Group's illicit money laundering scheme, which relied on parties identified herein to illegally access the U.S. financial system, including to facilitate payments involving the Target Properties.

    a.   As described in OFAC's press release, Rostam Qasemi was involved with both NIOC and the IRGC.

    b.   On February 10, 2010, OFAC designated Rostam Qasemi as an IRGC general who used companies to generate funds for the IRGC.

    c.   Search warrants from the email account of an Iships employee included an email chain from June 2014, showing that the Iships employee received a confidentiality agreement from Petro Iran Development Company ("PEDCO"), which OFAC has designated as a subsidiary of NIOC.  The confidentiality agreement related to the provision of oilfield services products to "the South Pars Oil Layer Project."  This email chain included an internal PEDCO email, which appears to have copied Rostam Qasemi.  An Iranian news article from May 2013 reported that Rostam Qasemi visited the South Pars gas field.     *See*     https://www.pogc.ir/ Default.aspx?tabid=711&article Type=ArticleView&articleId=4409.

45.     After Gibraltarian authorities seized Target Property 1, the IRGC Deputy Commander Rear Admiral Ali Fadavi, publicly stated on July 11, 2019, "we [IRGC] had rented the ship and we [IRGC] carried the cargo." https://www.reuters.com/article/us-mideast-iran-britain-guards-idUSKCN1U615B.

46.     On August 21, 2019, Iran's semi-official news agency said that Target Property 1 was currently leased to the IRGC.  This comment came in an interview with the head of IRGC's

navy, Alireza Tangsiri. *See* https://af.reuters.com/article/commoditiesNews/idAFL5N25H0R9. Iranian news subsequently retracted this statement. *See id*.

**B.       Recent Voyage of the Target Properties**

47.      Given its size and capacity, Target Property 1 is required to use the Automatic Identification System (AIS), which was developed in the 1990s as a maritime safety feature that exchanges vessel information electronically among ships that are near each other.

48.      Publicly-available AIS data revealed that, often between 2018 and 2019, Target Property 1 appeared to deactivate its AIS to conceal its location.  Specifically, from on or about November 1 through November 20, 2018, AIS data revealed that Target Property 1 loitered at the western end of the Persian Gulf near the Iran/Iraq border.  Target Property 1 deactivated its AIS as it travelled towards the Iranian port of Asaluyeh, a location where oil tankers are known to load and unload petroleum.  Target Property 1's AIS remained off until December 15, 2018.  When the AIS resumed functioning, the depth of Target Property 1 was consistent with oil having been loaded while the AIS was turned off.

49.      U.S. authorities learned from AIS data and witness interviews that, around January 16, 2019, Target Property 1 was co-located with an oil tanker named the *Kriti Island* in the Gulf of Oman, at which time it conducted a ship-to-ship transfer to the *Kriti Island*.  As noted below, Target Property 1 provided false certificate of origin documents related to this shipment.

50.      U.S. authorities also learned from AIS data and witness interviews that, around January 22, 2019, Target Property 1 was co-located with an oil tanker named the *Marshal Z* at which time it conducted a ship-to-ship transfer to the *Marshal Z*.  Shortly thereafter, the *Marshal Z* engaged in another ship-to-ship transfer. As noted below, Target Property 1 provided false certificate of origin documents related to this shipment.  OFAC named the *Marshal Z* in a March

2019 public advisory as having engaged in ship-to-ship transfers in the Gulf of Oman of petroleum destined for Syria.

51.     U.S. authorities learned from AIS data that Target Property 1's transponder turned off again from on or about April 8 to April 16, 2019, as it traveled in the Arabian Gulf toward Iran. Information obtained during the investigation revealed that, during this period, Target Property 1 received Iranian oil from Kharg Island, Iran.  Target Property 1's transponder became operational again on or about April 17, 2019, as it departed Kharg Island with Iranian oil.

52.     The Target Properties then traveled around Africa.

53.     On or about July 4, 2019, the British Royal Marines and authorities in Gibraltar detained the Target Properties for suspected violations of European Union sanctions on Syria.

54.     According to publicly-available news reporting, on or about July 11, 2019, the Royal Gibraltar Police arrested the captain and chief officer of Target Property 1 for such sanctions violations, however, these individuals and the Target Properties were ultimately released from Gibraltarian custody on or about August 16, 2019.

C.     **Illicit Payments Through U.S. Financial System Related to Target Properties**

i.     **Fraudulent Documents**

55.     Witness interviews revealed that individuals associated with Target Property 1 provided those parties who participated in the above-described ship-to-ship transfers with Target Property 1 with fraudulent shipping documents stating that Target Property 1 had obtained oil and departed from the Iraqi shipping port, Basra Oil Terminal.  U.S. authorities believe that these shipping documents were forged as a means to conceal the fact that Target Property 1 had actually

obtained oil and departed from Iran.  U.S. authorities presented copies of the shipping documents to the relevant authorities in Iraq, who confirmed that the documents were fraudulent.

56.     Based on similar investigations in the past, U.S. authorities believe that these fraudulent documents were created not only to deceive the parties involved in the above-described ship-to-ship transfers but also may have been created to deceive any financial institutions involved in the related financial transactions.  Financial institutions often request supporting documentation relating to financial transactions, particularly when they involve high-risk industries such as the transshipment of petroleum, as part of their anti-money laundering due diligence efforts.  Although such records may not have been presented to U.S. correspondent banks, the preparation of such documents is still consistent with known money laundering and bank fraud schemes.

57.     The Financial Action Task Force has urged all jurisdictions to apply enhanced due diligence measures to protect against the terrorist financing risk emanating from Iran and the threat this poses to the international financial system, which in turn has caused banks to further scrutinize transactions with possible Iranian entities.

58.     The Department of the Treasury has consistently underscored the risks of conducting business with entities associated with Iran.  It has warned that Iran continues to use deceptive tactics including front and shell companies to exploit markets in numerous countries to fund its nefarious activities.  These tactics include forging documents, obfuscating data, and hiding illicit activities under official cover of government entities, among many others.  On October 11, 2018, the Department of the Treasury issued a comprehensive advisory outlining the deceptive practices the Iranian regime employs to access the financial system with the intention of furthering its illicit activities.

59.     In addition to the use of fraudulent documents to deceive U.S. financial institutions, the actors in this investigation used multiples companies to avoid listing the ultimate senders and beneficiaries of U.S. dollar transactions, which flowed through the U.S. financial system.

**ii.     Co-conspirator Paradise Global Launders Funds as Part of This Scheme**

60.     The Al Aqili / Avantgarde Group 1 used Paradise Global,  a U.A.E.-based front company, as a payment intermediary as part of the scheme, including for petroleum tankers operated by Iships, such as Target Property 1.

61.     A commercial company database shows that Paradise Global is partially owned by a member of the Al Aqili Group, who is a shareholder and/or chairman of multiple Company Group 1 companies.  That Al Aqili Group member and Mohammad Saeed Al Aqili, who is designated by OFAC, both serve as directors of another Al Alqili Group company.

62.     There are numerous instances of Paradise Global coordinating payments with other Avantgarde Group 1 companies, including for Target Property 1, for example:

   a.   On July 8, 2014, the managing director of Paradise Global was copied on an email between the NIOC agent at Iships and another Iships employee, which included a quote to pay in U.S. dollars;

   b.   On August 31, 2014, an Iships employee asked Paradise Global to pay Iship expenses and copied employees of another Avantgarde Group affiliated company;

   c.   On August 31, 2014, Paradise Global, the NIOC agent at Iships, and other Avantgarde affiliated employees discussed the crew of Target Property 1 and petroleum tanker (Vessel 2);

   d.   On November 28, 2014, Paradise Global paid U.S. Company 2 for insurance premiums associated with Iships operated petroleum tanker (Vessel 2);

   e. On July 26, 2015, an accounting manager for Avantgarde Group and Iships sent a check from Paradise Global to Iships for Target Property 1 expenses.

63. Paradise Global laundered blocked funds through the U.S. financial system as part of this scheme.  Specifically:

   a. On February 3, 2015, an Oman-based front company (Oman Company 1) wired $699,975.00 to Paradise Global, which funds were blocked while transiting through a U.S. correspondent bank account (U.S. Bank 1); and

64. On February 4, 2015, Oman Company 1 wired Paradise Global another $299,975.00, which was also blocked while transiting through U.S. Bank 1.

### iii. Additional Laundering of Funds Using Multiple Intermediaries

65. U.S. authorities believe that multiple companies engaged in multiple financial transactions through the U.S. financial system related to the recent illegal shipment of Iranian oil. Specifically, the companies involved with these transactions were used as intermediaries to avoid listing the ultimate senders and beneficiaries on these U.S. dollar transactions; in some instances, the parties described herein used multiple payment intermediaries when dealing with the same counterparties.  This activity—the international movement of funds by front companies in connection with illegal activity and the provision of false information to U.S. financial institutions regarding the parties to financial transactions—violates U.S. bank fraud and money laundering laws.  These U.S. dollar transactions, which were routed through the United States, also would have required a license from OFAC, however, no such licenses were sought or received.

66. Subpoena returns from U.S. financial institutions revealed that in 2016, Iships made at least six U.S. dollar payments totaling US$34,108.79 to a U.S. company (U.S. Company 1). Records related to these payments referenced Target Property 1.  Publicly-available information

has revealed that U.S. Company 1 purports to provide petroleum tanker products and related logistics solutions.

67.     Subpoena returns from U.S. financial institutions also revealed that, on or about December 20, 2018, Anisa Shipping, an entity registered in Saint Kitts and Nevis, laundered US$4 million to Tricolor Enterprises Limited, another entity registered in Saint Kitts and Nevis.  This payment, which referenced Target Property 1 and an offshore oil rig, routed through a correspondent bank account in the United States because the payment was in U.S. dollars.  Information obtained during the investigation revealed that Tricolor Enterprises Limited is located at the same address in Saint Kitts and Nevis as Blue Energy Trade LTD, an oil procurement company sanctioned by OFAC for shipping petroleum to Syria.

68.     Subpoena returns from U.S. financial institutions further revealed that on or about December 26, 2018, Anikom Projects and Logistics FZE, an entity registered in the United Arab Emirates, wired US$1.3 million to Anisa Shipping.  This payment, which referenced Target Property 1 and an offshore oil rig, routed through a correspondent bank account in the United States because the payment was in U.S. dollars.

69.     Subpoena returns from U.S. financial institutions further revealed that, between on or about January 14 and 17, 2019, around the time Target Property 1 conducted the ship-to-ship transfers with the *Kriti Island*, Blutide FZE, an entity registered in Singapore, laundered approximately US$7,145,286.32 via multiple payments to Sicaro Group Corp registered in Saint Kitts and Nevis, which has common ownership with Tricolor Enterprises Limited.  One of these payments listed "Trade" on the wiring instructions.  This payment routed through a correspondent bank account in the United States because the payment was in U.S. dollars.

70.     Witness interviews revealed that Blutide FZE chartered the recent Target Property 1 petroleum shipment.  Due to the timing of Blutide FZE's payment, the fact that it chartered Target Property 1, and its association with other companies that made payments related to Target Property 1, U.S. authorities believe the January 14 to January 17 payment was also associated with Target Property 1.

71.     Subpoena returns from U.S. financial institutions revealed that, on or about January 29, 2019, Blutide FZE wired US$495,021.00 to a company in Switzerland for the *Kriti Island* to transfer oil from Target Property 1.  Documents associated with this payment indicated that the purpose of this payment was "Trade," which was the same instruction that Blutide FZE used when sending Sicaro Group Corp funds on or about January 14, 2019.  This payment routed through a correspondent bank account in the United States because the payment was in U.S. dollars.

72.     Company 7 was the technical manager for Target Property 1 beginning in or about 2013.  On April 24, 2019, Fourteen Star Shipping Management wired Company 7 $169,970.00 as a payment for crew management, which payment transited through the United States.  Company 7 and Fourteen Star Shipping Management are a part of a conglomerate of companies.  At this time, Target Property 1's crew was facilitating the planned transportation to Syria of Iranian petroleum.  As such, this transaction required a license from OFAC based on the SSR and ITSR.  No such license was sought or obtained.

iv.     **Illicit Anticipated Travel to Port Banias, Syria**

73.     As noted above, Company 7 has been the technical manager for Target Property 1. Company 7 is also the current operator and ship manager of petroleum tanker *Tour 2*.  A petroleum inspector at Port Banias, Syria, previously indicted in the District of Columbia for money laundering and Syrian sanction violations, corresponded with unindicted co-conspirators about the *Tour 2* unloading Iranian Light Crude Oil to the Banias Refinery Company on multiple occasions in 2016 and 2017.

74.     Prior to Target Property 1's detention in Gibraltar, a confidential source revealed that it was scheduled to arrive in Syria in early July.

75.     After Gibraltar detained Target Property 1, Gibraltar authorities recovered charts and electronic equipment, WhatsApp messages recovered from crewmembers' mobile devices, and crewmembers' statements, which revealed that Target Property 1 was destined for Port Banias, Syria.

76.     Emails between the prior captain of Target Property 1 and its managing agents regarding the April 2019 voyage of Target Property 1, dated between April 14 and July 2, 2019 revealed:

a.  The captain requested two months of provisions in view of the long voyage "to Syria";

b.  The captain ordered permits and charts for the return journey from "Syria to the [Arabian] Gulf via Suez";

c.  The captain asked (just two days before the vessel's detention) whether he was to land the ship's waste "in Gibraltar or in Syria"; and

d.  The captain requested (just two days before the vessel's detention) for certain stores to be arranged "at Syria," and the Managing Agent acknowledging in reply that the stores would be supplied "at your discharge port."

77.  Target Property 1's navigation charts showed a fully plotted route for the voyage from the Arabian Gulf (the "Gulf") to Baniyas, Syria.  Additionally, the Passage Plan plotted 38 specific "waypoints" for the route from the Gulf to Syria with final destination coordinates for a position off the coast of Banias, Syria.

78.  Target Property 1's electronic voyage summary, Cargo Loading Plan, Daily (Noon) Navigation Reports, and "Underkeel Clearance Calculation" all stated that its destination was Syria.

79.  Target Property 1's Passage Plan also outlined a return voyage, showing a plotted course from a position off the coast of Banias, Syria, to the Gulf.

80.  Target Property 1's Integrated Management System Manual contained 15 evaluation reports regarding safety drills and training of the crew while Target Property 1 was in route to Gibraltar.  These documents each separately record that the vessel was bound for Syria.

81.  The refinery at port Banias was one of the only places in Syria able to accept a discharge of Target Property 2.

## IV. CONCLUSION

82.     Based on the facts described above, there is probable cause to believe that the Target Properties are foreign assets or sources of influence of the IRGC, a designated terrorist organization engaged in planning and perpetrating federal crimes of terrorism, and thus subject to forfeiture.  There is further probable cause to believe that U.S. dollar wires were sent by parties affiliated with the IRGC for the benefit of Syrian entities, which are proceeds of, traceable to, and involved in the Target Properties, also making them subject to forfeiture.

Respectfully submitted,

Signed Telephonically
Thomas Tamsi
Special Agent
Homeland Security Investigations

Subscribed and sworn before me telephonically by Special Agent Thomas Tamsi per Fed. R. Crim. P. 41(d)(3) on this 30th day of August, 2019.

_____
ROBIN MERIWEATHER
UNITED STATES MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

# Attachment A

Target Property 1

